## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**CAROL A. HOWARD,**

**Plaintiff,**

**v.**                                    **No. 16-1250-DRH**

**GATEWAY REGIONAL MEDICAL CENTER**
**and MANDI HANDFELDER,**


**Defendants.**

## <u>MEMORANDUM and ORDER</u>

**HERNDON, District Judge:**

## <u>Introduction and Background</u>

Pending before the Court is defendants Gateway Regional Medical Center's and Mandi Handfelder's motion for summary judgment on Counts I and II of plaintiff's complaint (Docs. 49 & 50). Defendants maintain that "[t]his case involves nothing more that Plaintiff's hypersensitive reactions to objectively innocuous conduct, her unfounded assumptions regarding others' actions and motivations, and her blatant disregard of the undisputed facts." Plaintiff opposes the motion (Doc. 51). Based on the record, the applicable law and the following, the Court denies the motion.

On November 15, 2016, Carol A. Howard, a licensed practical nurse ("LPN"), filed suit against her former employer Gateway Regional Medical Center ("Gateway"), her former supervisor, Mandi Handfelder, and Joshua Lee Cann (Doc.

1). Howard's complaint contains three counts: Count I, for violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., against Handfelder and Gateway; Count II, for intentional infliction of emotional distress under Illinois common law against Handfelder and Gateway, and Count III, for intentional emotional distress under Illinois common law against Cann. Howard alleges that Howard and Gateway refused to accommodate her disability, breast cancer, by scheduling mandatory staff meetings when Howard had scheduled medical appointments, that Handfelder threatened Howard with possible disciplinary actions for failure to attend the staff meetings, that Handfelder refused to allow Howard to wear a cap to work when Howard was losing her hair and that Howard underwent a radical mastectomy because she was fearful of taking time off for additional chemotherapy for fear of her employment. Howard also claims that Handfelder intentionally disclosed her medical information/diagnosis and requests for reasonable accommodations to Joshua Cann, Handfelder's boyfriend. Lastly, Howard claims that Cann, while at a Christmas party, told Howard "in a stern voice that she needed to stop playing the 'cancer card.'" (Doc. 1, p. 5).

On January 31, 2017, the Court dismissed with prejudice Hanfelder as a named defendant in Count I and denied the motion to dismiss as to Count II (Doc. 19). Thereafter, on June 26, 2018, pursuant to Howard's response to the notice of impending dismissal, the Court dismissed Cann from the case (Doc. 56). On July 30, 2018, the Court granted defendants' motion to exclude the opinions and

testimony of plaintiff's expert, Jay Liss, M.D (Doc. 60).

As the motion for summary judgment is ripe, the Court turns to address the merits of the motion.

## Facts

Gateway is a community health care provider, offering inpatient, outpatient, medical, surgical, and emergency care services in Southwest Illinois. Gateway partners with the United States Steel Corporation ("U.S. Steel") and staffs U.S. Steel's Veeder Health Center ("Veeder Clinic"), which is located within the U.S. Steel's Granite City, Illinois facility.

Howard is a former Gateway employee who worked as an LPN in the Veeder Clinic from April 28, 2014 until March 27, 2015. While at Veeder Clinic, Howard worked four days per week from 9:00 a.m. until 5:30 p.m. As an LPN, Howard was responsible for managing the flow of patients through the Veeder Clinic and delivering quality health care to patients presenting to the Veeder Clinic.

Handfelder, RN, worked for Gateway as the Clinic Coordinator of the Veeder Clinic from 2013 until January 2016. As Clinic Coordinator, Handfelder was responsible for keeping the flow of the Veeder Clinic running smoothly, ensuring U.S. Steel employees completed their physical examinations, conducting orientation for new Gateway employees, training Gateway employees, holding monthly meetings for Gateway employees, and supervising Gateway employees' work at the Veeder Clinic, including disciplining employees when appropriate.

Handfelder directly supervised Howard during Howard's employment with Gateway. Dan Stephens, Director of Occupational Medicine, supervised Handfelder.

On August 11, 2014, Howard was diagnosed with Stage 2, Grade 2A breast cancer. That same day, Howard informed Handfelder of her breast cancer diagnosis. According to Howard, Handfelder began harassing Howard as soon as she told Hanfelder about the cancer treatments.

On August 19, 2014, Howard was 15 minutes late to work returning from a breast MRI scan. Howard and her husband got a hotel room the night before the breast MRI scan so they could be at the MRI on time. After the breast MRI scan and on the way to work, Howard became frantic and screamed that she was going to lose her job when they hit traffic. According to Howard, Handfelder reprimanded her for being 15 minutes late to work that day. Howard broke into tears and said to Handfelder: "I've either got to treat this or I don't. I am going to die."

Howard did not ask in advance for any time off from work to attend this MRI scan. Pursuant to Gateway's policies, employees must provide notice to their supervisor if they are unable to work their scheduled shifts. Employees' shift schedules were created between two weeks and one month in advance.

Howard scheduled most of her appointments to receive treatment for her cancer on her days off of work. Any time that Howard needed more than three days off from work for medical treatment, Howard submitted a written medical

request for leave on a company form. Howard verbally asked Hanfelder for smaller period of time off for medical treatment.

Tina Worthen began working at Gateway the same day as Howard and in the same department as Howard. Worthen made appointments and filing work at the Veeder Clinic for steelworkers. Handfelder was also Worthen's supervisor. Worthen kept a book of daily occurrences or log which she left at her desk when she left Veeder. In the summer of 2014, Howard told Worthen of her cancer diagnosis. Howard also told Worthen that she was worried about having enough time off to do her cancer treatments.

Worthen testified that Handfelder gave Howard a verbal reprimand for being late to a mandatory meeting as Howard was late because she had a MRI. That day, Worthen testified that Handfelder took Howard into the conference room and Howard came out crying. Additionally, Worthen testified that Howard was very tired, very sick and would constantly run to the bathroom at work. Also, Worthen testified that at least on two occasions she overheard Handfelder inform Howard that Howard's work schedule could not be changed or altered in any effort to allow her to attend doctor's appointments or any treatment.

On September 22, 2014, after Howard began to lose her hair due to her chemotherapy treatments, Howard told Handfelder that she would need to wear a cap to work. Howard did not specify the type of cap that she wanted to wear. In response, Handfelder told Howard that she needed to approve the cap as

Handfelder thought that Howard wanted to wear a baseball cap. The next day, Howard wore a surgical cap to work as that was the type of cap that Howard wanted to wear. Handfelder never told Howard that she could not wear the surgical cap to work.

One day at work after seeing Howard in tears, Handfelder suggested that Howard see an Employee Assistance Program ("EAP") counselor. Howard voluntarily made an appointment to see and EAP counselor on October 1, 2014,

In October 2014, after Howard's second chemotherapy treatment, Howard told Handfelder that she was protected under the ADA. Handfelder responded that she did not know what the ADA was. Afterwards, Handfelder consulted with Gateway's Human Resources Department ("HR") to gain more information on the ADA.

On November 12, 2014, Howard requested 21 days of medical leave from December 9, 2014 until December 29, 2014 and Handfelder approved the leave. Later that day, Howard revised her request for medical leave, to request 21 days of leave from December 16, 2014 until January 5, 2014 and Handfelder approved that request. On January 28, 2015, Howard requested nine days of medical leave from February 18, 2015 to February 26, 2015 and Handfelder approved that leave. Outside of her approved medical leave, Howard only took two days off from work to attend medical appointments and receive treatment for her cancer.

Howard finished her chemotherapy treatments on November 13, 2014. In

order to treat the remaining cancer with radiation, Howard would need six weeks of radiation, five days per week. Howard did not ask Handfelder off from work to receive radiation treatment. Howard assumed that Handfelder would not grant her time off from work to receive radiation.

Howard chose to have a mastectomy instead of radiation. No doctor stated to Howard that radiation was a better course of treatment than a mastectomy and no doctor ever recommended against a mastectomy. Howard testified that she wanted to conserve her breasts and avoid mastectomy. Howard was off work from December 15, 2014 to January 8, 2015 for her mastectomy.

When Howard returned to work from her sick leave for the mastectomy, she was selected for a random drug test. Handfelder too was subjected to a random drug testing while employed by Gateway. Handfelder walked Howard to Gateway's Occupational Health Building for the drug test. Stephens notified Hanfelder which employee was selected for a drug test. Howard believes that Handfelder selected her for the random drug test.

On January 24, 2015, Howard attended a Gateway Christmas party. Handfelder's ex-husband, Cann, was at this party. Cann made a comment that Howard would not "be able to use the cancer card." Howard believes that Handfelder told Cann that Howard had cancer. No one told Howard that Handfelder told Cann about Howard's cancer diagnosis. Howard was shocked and in tears. Worthen testified that her and her sister, Tammy E. Cox, heard Cann

make the cancer card comment to Howard at the Christmas party.

On February 18, 2015, Howard underwent breast reconstruction surgery. The next day, Howard called Handfelder and told her that she would not return to work until February 25, 2015. Howard contends that she gave February 25, 2015 as the day for return to work only because this is the date Handfelder stated she would be back because Handfelder had breast augmentation and she knew it would not take long for recovery. On February 20, 2015, Handfelder called Howard at 5:15 p.m. and advised Howard to call HR regarding leave under the Family Medical Leave Act ("FMLA"). Howard called HR. Ten minutes later, at 5:25 p.m. on February 20, 2015, Handfelder called Howard again. Howard did not answer the call. Handfelder left a voicemail on Howard's phone stating that HR required additional paperwork regarding Howard's request for FMLA leave. Howard eventually reached HR and was not eligible under the law.

Handfelder never told Howard that she took any action because of Howard's cancer or some desire to not have Howard at Gateway.

On March 3, 2105, Howard distributed a document drafted by Howard titled "Request for Reasonable Accommodations and Protection from Retaliation" to Reva Weems, Director of HR, Ed Cunningham, Chief Executive Officer at Gateway, and Handfelder. In this request, Howard asked for flexible work hours. She also requested occasional assistance with blood draws. She also requested time to attend medical appointments for breast reconstruction procedures. Additionally,

in this document, Howard requested to not be subjected to discipline or lower evaluations for missing a meeting due to a medical appointment. Also, Howard asked to be treated with a basic level of compassion.

On March 9, 2015, Howard turned in resignation letter which was effective on March 27, 2015.

Dr. Craig Harms is Howard's general physician. On July 23, 2014, Howard went to see Dr. Harms complaining of a lump in her breast. After examining the lump, Dr. Harms felt the lump was highly suspicious for cancer. At this time, Howard's demeanor was negative for anxiety, depression or insomnia. Later on August 21, 2014, Dr. Harms prescribed Xanax for Howard due to her complaint of anxiety. Howard complained of crying a lot and being anxious about chemotherapy.

During her cancer treatment, Dr. Susan Luedke was one of Howard's doctors. Dr. Luedke recommended surgery, radiation therapy and chemotherapy. Dr. Luedke treated Howard while she underwent chemotherapy. During this time, Dr. Luedke noted that Howard was depressed, angry and positive for a dysphoric mood and decreased concentration. Dr. Luedke also noted that Howard complained of reduced cognitive function know as chemo brain. Dr. Leudke as stated that Howard expressed fear of losing her job while undergoing chemotherapy and Dr. Luedke wrote a letter noting this.

Dena Bush, a R.N. licensed in Illinois and Missouri, testified that she found

Howard crying after her cancer diagnosis and that she found Howard crying after Howard got into trouble for being 15 minutes late to a mandatory meeting. Bush also observed Howard crying every time she relieved Howard at work until Howard had her surgery. Howard told Bush that she was fearful of doing radiation since it would force her to be late for work and she would be disciplined for being late. Howard said that Handfelder told her she could not be scheduled for that. Howard also told Bush that she opted for a mastectomy because of her inability to have her work schedule adjusted to accommodate her radiation. Howard told Bush that she expressed fear of losing her job and insurance. Bush testified that Handfelder was uncaring towards Howard. Bush also testified that Handfelder lacked nursing and management experience and lacked compassion towards the employees.

Jessica Greenfield, a R.N. who is in school studying to be a nurse practitioner, worked with Howard and Handfelder at the Veeder clinic. Greenfield testified that during Howard's cancer treatments Howard was more emotional, sick a lot and fearful of losing her job. Greenfield stated that Handfelder took a personal interest in the errors that Howard made. Greenfield said that Howard was treated different, that Howard was pulled into the conference room a lot and that Howard would come out emotional and crying. Greenfield cover shifts for Howard during her cancer treatment. Greenfield testified that Handfelder would not cover shifts and that Handfelder gave Howard a very hard time about taking off a couple hours just to come in late so that Howard could have testing done. As far as Greenfeld

knows, she was the only one to cover shifts for Howard.

One time during her employment with Gateway, Greenfield had been in the ICU for pneumonia and ordered by her doctors not to talk. Handfelder made Greenfield call in every day to work and told her "I don't know what will happen to your job." Handfelder was aware that Greenfield may have to go on a ventilator if she tried to talk and Handfelder insisted that Greenfield's husband give the phone to Greenfield so she could talk to Handfelder.

Howard told Greenfield that she did not know how she would get radiation treatments done because she did not know how she would be able to miss work and have her shifts covered. One time during Howard's chemotherapy, Howard had a diarrheal episode and she was wearing paper shorts that the patients at the Veeder would wear. Greenfield asked her why she did not take time off of work because the chemotherapy was making her so sick and Howard told her that she could not. Handfelder told Howard that she could have time off for her cancer treatment if she had her shifts covered. Greenfield testified that Howard was worried about losing her job, that she was in low spirits and had very low self-esteem.

## Summary Judgment

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in

[their] favor." *Id.* (alteration in original) (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## Analysis

### Count I – ADA claim

#### Failure to accommodate

"The ADA requires employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].' " *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)). To succeed on a failure-to-accommodate claim, "(1) the plaintiff must be a qualified individual with a disability; (2) the employer must be aware of the plaintiff's disability; and (3) the

employer must have failed to reasonably accommodate the disability." *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). Gateway focuses on the third element, arguing that Howard cannot establish that it failed to reasonably accommodate her alleged disability, because "

Under the ADA, a "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position ..., and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). "The facts relevant to a determination of whether a medical leave is a reasonable accommodation are the facts available to the decision-maker at the time of the employment decision." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 928 (7th Cir. 2001). The ADA does not require an employer to provide the exact accommodation that an employee requests. *Cloe*, 712 F.3d at 1178. Rather, an employer must do something "that effectively accommodates the disabled employee's limitations." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005). An accommodation need not be made, however, if it "would impose an undue hardship" on the operation of the employer's business. 42 U.S.C. § 12112(b)(5)(A). "The defendant has the burden to prove that the accommodation would create an undue hardship on the business, but the plaintiff must first show that the accommodation [she] seeks is reasonable on its face." *Majors*, 714 F.3d at 535 (internal quotation marks omitted).

Defendants argue that Howard's failure to accommodate claim fails as a

matter of law due to the simple fact that Gateway reasonably accommodated Howard's disability. Specifically, Gateway argues that it reasonable accommodated Howard in every concrete way she requested and providing a "basic level of compassion" is not a reasonable accommodation under the ADA. While defendants maintain that they reasonably accommodate Howard and her illness, there are many witnesses that contradict defendants' version of the events. Specifically, Worthen testified that she heard Handfelder tell Howard that Howard's work schedule could not be changed or altered to allow Howard's doctor's appointments or treatments and that Howard would have to find coverage and then Handfelder would have to approve the change. In one instance, Worthen heard Howard ask off for treatment at 2:00 p.m. the next week and Handfelder told her no. Worthen also testified that at least two times in her presence, Handfelder told Howard that Howard's work schedule could not be altered to accommodate the illness. Further, Greenfield testified that Howard was treated differently than other employees, that Handfelder took personal interest in the errors that Howard made and that Handfelder would pulled Howard into the conference room more than others during her cancer treatment. Thus, these disputes of material fact must be addressed by a jury.

**Hostile Work Environment**

Additionally, Gateway seeks judgment on Howard's claim that she was subjected to a hostile work environment. While the Court of Appeals for the

Seventh Circuit has not decided whether a hostile work environment claim is actionable under the ADA or Rehabilitation Act, its analysis of such claims suggests it may be. *See Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009) (the incidents described failed to meet the standard of a hostile work environment claim). Regardless, if the cause of action exists, it appears analogous to Title VII hostile work environment claims, and so the court will analyze this claim under that framework. *See Silk v. City of Chi.*, 194 F.3d 788, 804 (7th Cir. 1999) (analyzing ADA hostile work environment claim, without deciding whether such a claim exists, under the Title VII framework).

To succeed on a hostile work environment claim, Howard must show that: (1) her work environment was both objectively and subjectively offensive; (2) the harassment was based on her disability; and (3) the conduct was sufficiently severe or pervasive so as to alter the conditions of her employment. *See Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016); *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 978 (7th Cir. 2009). "An objectively hostile environment is one that a reasonable person would find hostile or abusive." *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Courts must consider the totality of circumstancing in evaluating whether a workplace is hostile, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance. *Harris*, 510 U.S. at 23.

Gateway argues that Howard's hostile work environment claim fails as a matter of law because Howard was not subjected to harassment based on her disability that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.   Gateway contends that the behavior about which Howard complains does not come close to approaching the level of severity necessary to establish a hostile work environment claim. Again, viewing the evidence in the light most favorable to Howard, the Court finds that there are disputes of fact as to the level of the severity in Howard's hostile work environment claim.   The Court finds that a reasonable jury could conclude that defendants' actions did not amount to innocuous conduct.   In addition to the testimony/conduct noted supra, the Court concludes that a jury could find it unreasonable and hostile: (a) to subject Howard to a random drug screen on the first day back to work after surgery; (b) by telling Howard that there would not be changes in her schedule to accommodate her cancer treatments; (c) by calling Howard in to the conference room more than others while she was going through cancer treatments; (d) by Handfelder taking personal interest in Howard's errors; and (e) by telling Howard that she needed to return from work a short time after her mastectomy.   Thus, the Court denies the motion to this claim as well.

**Constructive Discharge**

The ADA statute provides relief when an employer has engaged in any

number of discriminatory activities, but absent among these is a "constructive discharge." 42 U.S.C. § 12112. Even if "constructive discharge" is not mentioned *as such*, however, it is no stretch to conclude that the kinds of activities that could give rise to a  constructive  discharge  claim would fit within the enumerated activities prohibited by the statute.  For example, if an employer makes a working environment intolerable because of an employee's disability, that could constitute "discriminat[ing] against a qualified individual on the basis of disability in regard to ... advancement ... [or] .... other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). It could also constitute "limiting ... [an] employee in a way that adversely affects the opportunities or status of such ... employee" under §(b)(1). Thus, the Seventh Circuit has had little trouble entertaining constructive discharge claims under the ADA. *See, e.g., Wright v. Illinois Dep't of Children & Family Servs.,* 798 F.3d 513, 527 (7th Cir. 2015); *Chapin v. Fort–Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010).  An employee is constructively discharged when, from the standpoint of a reasonable employee, the working conditions become unbearable. *See Chapin v. Fort–Rohr Motors, Inc.,*  621 F.3d 673, 679 (7th Cir. 2010).

An employee's constructive discharge can come in two forms.  *See id.*   In the first form, an employee resigns due to alleged discriminatory harassment. Such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally

expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit.  *Id.*  (citation omitted). The second form of constructive discharge "occurs '[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated.'"  *Id.* (alteration in original) (quoting *EEOC v. Univ. of Chicago Hosps.,* 276 F.3d 326, 332 (7th Cir. 2002)).

Again, Gateway argues that Howard's constructive discharge claims fails because Gateway did not make Howard's working conditions so intolerable – in a discriminatory way – that a reasonable person would have been compelled to resign.  Specifically, defendants argue Howard was not subjected to a hostile work environment on the basis of her disability, and she was not confronted with an aggravating situation beyond ordinary discrimination that would compel a reasonable person to resign.  Based on the record and the reasoning *supra*, the Court finds that disputes of material fact exist that a jury must decide whether Howard was hypersensitive and whether defendants' actions amounted to innocuous conduct.  Thus, the Court denies the constructive discharge claim.

**Count II – Intentional Infliction of Emotional Distress**

To state a claim for IIED, Howard must show that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress; and (3) the defendant's conduct did

cause severe emotional distress." *Naeem*, 444 F.3d at 605. Illinois courts have required a "heightened level of egregiousness" and conduct that has been "outrageous" and "extreme" to maintain an IIED claim. "IIED requires more than 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' *McGrath,*127 Ill.Dec. 724, 533 N.E.2d at 809 (citation and internal quotation marks omitted).

Under Illinois law, a defendant's conduct must be such that the "'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim: Outrageous!' " *Doe v. Calumet City*, 641 N.E.2d at 507 (*quoting* Restatement (Second) of Torts § 46 cmt. D (1965)). In *McGrath*, the Supreme Court of Illinois cited non-exclusive factors which can help inform this rather fluid standard. *See McGrath*, 533 N.E.2d at 809–10. One factor that influences the extreme and outrageous nature of the conduct is the degree of power or authority that the actor has over the plaintiff. *Id*.

In the employment context, Illinois courts are hesitant to conclude that conduct is extreme and outrageous unless an "employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Richards*, 869 F.3d at 567 (quoting *Naeem*, 444 F.3d at 605). The fear is that, "if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for

intentional infliction of emotional distress, nearly every employee would have a cause of action." *Naeem*, 444 F.3d at 605 (quoting *Graham v. Commonwealth Edison Co.*, 318 Ill.App.3d 736, 746 (1st Dist. 2000)).

Lastly, defendants argue that Howard's IIED claims fail as a matter of law as the behavior about which she complains does not come even remotely close to approaching the level of severity necessary to establish an IIED claim under Illinois law. Defendants contend that Handfelder's alleged conduct simply does not constitute the type of extreme and outrageous behavior that no reasonable person should have to endure. The Court disagrees.

Viewing the facts in Howard's favor, the Court finds that Howard has presented sufficient factual questions upon which a jury should be permitted to consider her claim for intentional infliction of emotional distress. A reasonable jury could conclude that Handfelder knew Howard was sick and that she was in a weakened physical and emotional condition. Further, a reasonable jury could conclude that Handfelder told Cann about Howard's illness as the Christmas party was the first time Howard and Worthen met Cann and he made that statement to Howard about the cancer card. Also, a reasonable jury could conclude that the timing of the random drug test of Howard was suspect and meant to harass Howard. Coupled with the reasoning denying the arguments regarding the ADA claims, the Court finds that disputes of material fact exist as to this claim. Accordingly, the Court denies the motion for summary judgment as to plaintiff's

claim for intentional infliction of emotional distress.

**Conclusion**

Accordingly, the Court **DENIES** defendants' motion for summary judgment on Counts I and II of plaintiff's complaint (Doc. 49). Also, the Court **DIRECTS** the parties to contact Magistrate Judge Donald J. Wilkerson's chambers to schedule a settlement conference, if beneficial. Lastly, due to the undersigned's trial/work schedule and impending retirement, this case will be reassigned to another district judge at a later date.

**IT IS SO ORDERED.**

Judge Herndon
2018.10.29
17:07:35 -05'00'

**United States District Judge**